Filed 8/1/23  In re Z.W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re Z.W., a Person Coming Under the Juvenile Court Law. | D081748 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Petitioner and Respondent,<br><br>v.<br><br>N.B.,<br><br>Defendant and Appellant. | (Super. Ct. No. J521163) |


APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel and Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent.

N.B. (Mother) appeals the juvenile court's jurisdictional and dispositional findings and orders in a Welfare and Institutions Code[1] section 300 dependency proceeding for her son, Z.W. Mother argues substantial evidence does not support the juvenile court's jurisdictional findings under section 300, subdivision (b). She also argues that there was no substantial evidence supporting the juvenile court's orders removing Z.W. from her custody under section 361, subdivision (c). We disagree and conclude that substantial evidence supports the court's jurisdictional and dispositional findings and orders.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Background Information*

Z.W. is Mother's first child with her husband, T.W. (Father).[2] At the time of trial, they were expecting their second child together.

Mother's child welfare referral history includes a report from 2018 that she was manic and paranoid after using THC regularly, including at least once "laced with crack." Around that time, she had multiple psychiatric hospitalizations and refused to accept or treat her diagnosis of bipolar disorder. The referral was determined to be "inconclusive as [the social worker] was unable to locate the family."

B.    *Z.W.'s Birth*

Mother gave birth to Z.W. in Hawaii in November 2021. She had received inconsistent prenatal care due to chronic back pain. Mother was diagnosed with a "mild substance use disorder in pregnancy." She stopped

---

[1]    All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2]    Father is not a party to this appeal.

using narcotics three weeks before Z.W. was born because she did not want him to suffer "withdrawal problems." She used marijuana two days before his birth. Although Z.W. tested negative for drug exposure, the hospital advised that he needed to stay in the hospital for three to five days to be monitored for withdrawal symptoms. Mother also was advised to avoid marijuana and narcotics while breastfeeding.

A few weeks after Z.W. was discharged from the hospital, Mother was placed on a psychiatric hold and Z.W. was removed from his parents' care. According to Mother, she was experiencing postpartum depression, and she reported to Hawaii's child welfare services that T.W. was not a good father, had an alcohol problem, and was too forceful with Z.W.'s feedings. After Mother was discharged, Z.W. was returned to his parents' custody.

C.    *Z.W.'s Medical Procedures*

In February 2022, Mother brought Z.W. to a children's hospital in San Diego for noisy breathing. Mother told the San Diego hospital staff that the hospital in Hawaii had "implanted a foreign body" into Z.W. She further stated that the doctors "took [Z.W.] away for studies [and] now he has noisy breathing." Z.W. received a foreign body x-rays series, which was normal. The hospital staff advised Mother he could have laryngomalacia,[3] and he was discharged home.

The next day, Mother took Z.W. to a different hospital for noisy breathing and a possible foreign body. Mother stated to the staff, "I know [Z.W.'s] rectum has been [tasered] and something has been inserted at some point." Hospital staff ordered a chest x-ray, which showed normal results.

---

[3]    Laryngomalacia is an abnormality of the larynx (voice box) that causes the airway to collapse inward as air goes to the lungs. The condition generally is noticeable at birth or shortly afterwards, and then slowly improves until it fully resolves when the child gets older.

Mother became upset, stating that no one was examining Z.W. and everyone was trying to make her feel crazy. Hospital staff contacted law enforcement. Father reported to hospital staff that Mother had a history of bipolar depression with mania, and she was not on medication.

The next day, parents brought Z.W. to a third hospital. Mother again insisted a doctor in Hawaii had inserted something into Z.W. She further claimed that the doctor in Hawaii was making Z.W. get shocked when she answers her phone or puts him down to rest. Z.W. was examined and no concern was found.

The family returned to Hawaii and, in April 2022, Mother took Z.W. to a medical center for concerns about breathing and a retained foreign body. The doctor diagnosed Z.W. with laryngomalacia and advised Mother that Z.W.'s condition would slowly improve until it fully resolves when he is older.

Also, in April 2022, Mother took Z.W. to a hospital emergency department due to concerns for his noisy breathing and a retained foreign body. The medical staff took a foreign body x-ray of Z.W., and the results were normal. They explained the diagnosis and symptoms of laryngomalacia, documented their concern for Mother's delusional behavior and possible factitious disorder, and made a report to Hawaii's child welfare services. Child welfare services refused to open a new investigation because it had already determined Father was safe following a previous report raising similar concerns. The medical staff discussed with parents the plan for a follow up appointment at the ear, nose, and throat clinic.

In November 2022, the parents took Z.W. to the emergency room at a children's hospital in San Diego because he had been nauseous and vomiting for five days. Mother was concerned that the doctor in Hawaii had put something in Z.W.'s airway and a radiopaque plastic straw in his rectum.

4

She also complained that Z.W. has a "valve" in his bottom that "tazes" him, causes him pain, and allows him to have timed stools. The medical staff documented that Mother was "exhibiting concerns consistent with psychiatric illness." The medical staff examined Z.W. and found no objects. They discharged him and referred him to the ear, nose, and throat department.

In December 2022, Mother took Z.T. to the ear, nose, and throat department. Medical staff gave Z.W. a flexible laryngoscopy, which revealed moderate laryngomalacia and no foreign body. Due to concerns for difficulty swallowing, the medical staff admitted Z.W. to the hospital for further evaluation and a possible "triple scope" procedure.

A pediatrician specializing in child abuse evaluated Z.W. for possible medical child abuse. She explained: "If parents continue to request medical evaluations and/or treatments that are not warranted this would be consistent with medical child abuse." She concluded that "[t]here is clear evidence that [M]other's persistent delusions have resulted in unnecessary medical testing." She was concerned that Z.W. may face neglect due to Mother's "incapacitation due to her untreated medical conditions." The doctor also noted that Mother's "drug seeking behavior" was concerning. She also had "significant concerns for [F]ather's ability to be protective."

The doctor opined: "Caregivers with untreated psychotic symptoms related to foreign bodies inside their children pose an extreme risk to those children as they may attempt to remove these perceived foreign objects on their own. Attempted removal of perceived internal objects can result in severe and/or potentially fatal harm." "If [Z.W.] were to be returned to the environment in which [Mother] has ongoing psychotic symptoms, in which there is domestic violence, and in which there is concern for substance

abuse/misuse, it would place him at extreme risk of ongoing and potentially escalating forms of maltreatment to include the possibility of death."

D. *Agency Investigation*

San Diego County Health and Human Services Agency (Agency) received a report on its child welfare hotline from a caller who expressed concern about Mother's mental health and Father's inability to protect Z.W. Father told the social worker that he understands the concern for Mother's mental health, although he continued to be present when Mother asked for additional examinations of Z.W. despite proof there is no foreign body present in Z.W.

While at the hospital with Z.W., Mother reported having chronic back pain, postpartum depression, and postpartum anxiety. She wanted medication. The hospital staff observed Mother kicking Father in the hospital room.

Mother refused to speak with a social worker at the hospital and would not allow the social worker to have access to Z.W. Mother told hospital personnel she would not feed Z.W. while he was recovering from a medical procedure, insisting she wait until the doctor checked on him.

While at the hospital, Father explained to the social worker that he understood Z.W.'s condition was unrelated to Mother's concern about a foreign object in Z.W.'s body, but he allowed Mother to bring Z.W. to the hospital to "ease her mind." He also reported that he wanted Z.W. but he did not want Mother. "I don't feel he will be safe with her; those procedures are bad. I don't want her to be around him."

In December 2022, law enforcement placed Mother on a 72-hour psychiatric hold for threatening to cut Father's throat while he slept. The

6

social worker could not visit Mother during the hospitalization due to the hospital's visitation policy.

When the hospital released Mother, Mother was taking medication. A week later, Mother told the social worker, "Everything that is for bipolar people makes you sedated; you cannot be a mother taking bipolar meds." Mother believed that she only needed pain medication because her bipolar symptoms were triggered by her back pain.

Mother told the social worker she used marijuana and medication for muscle spasms when she could not sleep, and pain medication during the day. She later denied using any pain medication because she was pregnant. Mother insisted that Z.W. has medical conditions, but "[t]he problem is that no doctors can find it."

E.    *Detention Report*

Z.W.'s grandmother reported that Mother was hospitalized four times for bipolar and behavior issues and needed help to treat her bipolar disorder. When Mother was released from the hospital, she would stay on her bipolar medication for two weeks at most. Still Z.W.'s grandmother did not have any concern about Mother hurting her children or being physically abusive to them.

Mother disclosed a history of domestic violence in her relationship with Father, including an incident in which she brandished a knife at him because he was becoming aggressive. Mother also reported Father drank alcohol to the point of physically injuring himself.[4] After his arrest, Mother "did not

---

[4]    In December 2022, Father sought and received a temporary restraining order against Mother to protect Z.W. A few days later, he was arrested for child endangerment. We do not detail these facts because they are not relevant to resolving Mother's appeal. Father has not appealed the court's order.

trust him" because he was an "abusive raging alcoholic" who drank whenever he had money. Mother reported she did not need mental health treatment.

The Agency was concerned that if Z.W. were returned to Mother's care, "he is at substantial risk of suffering physical and emotional harm due to [Mother's] untreated mental health." Mother's "continued delusions that [Z.W.] has a foreign object in him raises great concern for [her] ability to care for [Z.W.]" Despite Father "reporting concern for [Mother's] mental health, he continued to accompany her with [Z.W.] to the hospital to have procedures." He also "has significant alcohol abuse" that he is just beginning to address. The Agency determined voluntary services would not be appropriate because "the parents have not demonstrated insight or acknowledgement into the concerns."

F.     *Dependency Petition and Detention Hearing*

In December 2022, the Agency filed a petition alleging Z.W. was a child described by section 300, subdivision (b)(1) because he had suffered, or there was a substantial risk he would suffer, serious physical harm or illness from the inability of his parents to provide regular care for him due to the parent's mental illness or substance abuse. It detailed Mother's mental illness and also alleged that Father became distracted while intoxicated and had a history of alcohol abuse rendering him unable to provide regular care.

At the December 2022 detention hearing, Mother and Father informed the court that they were living together despite the issuance of the temporary restraining order against Mother. The Agency asked to detain Z.W. in a licensed foster home because the maternal relatives were no longer interested in placement.

The court made a prima facie finding on the petition and determined there was a substantial danger to Z.W.'s physical health, and there were no

reasonable means to protect him without removing him from the parents' custody. It found that reasonable efforts had been made to prevent or eliminate the need for removal, and there were no reasonable services that would prevent the need for further detention. The court ordered Z.W. detained in a licensed foster home or children's shelter and authorized the Agency to detain him with an approved relative or a nonrelative extended family member with the concurrence of minor's counsel. The court also ordered liberal, supervised, separate visits for each parent consistent with any other court orders, including the temporary restraining order.

The court ordered Mother to participate in a psychological evaluation to assist the Agency in connecting her to appropriate treatment and services and "for planning going forward." The court noted that the psychological evaluation would be used for dispositional purposes only and not for jurisdiction. The court also ordered Father to meet with a substance abuse specialist. The Agency was ordered to provide voluntary services to the parents, including timely referrals for the psychological evaluation and the substance abuse specialist. Father signed the consent for examination and treatment paperwork for Z.W. to have access to healthcare while he was detained, after Mother had refused to sign.

G. *The Agency's Jurisdiction/Disposition Report and Initial Hearing*

In January 2023, the Agency reported that Father got a job with night shift hours, which helped him remain sober because "nobody drinks in the morning." He was meeting with the substance abuse specialist and getting into a substance abuse program, but he did not consider himself an alcoholic. He also believed Mother was getting better now that she stopped smoking marijuana because it had made her "paranoid." He did not think she wanted

9

Z.W. to undergo any more procedures. Both reported their belief that he was "fine now" and would outgrow his "throat problems."

The restraining order was dropped at the parents' request. Mother reported she and Father were trying not to involve other people, including her relatives, in her case because her family thinks she is "crazy." Cutting off those relationships helped her cope. They were staying in a motel because they were kicked out of their housing.

In a January 2023 interview with the social worker, Mother denied having any mental health conditions. She believed she had been misdiagnosed with bipolar disorder and that her problems were pain related. She was participating in weekly virtual therapy to learn new coping mechanisms for stress. She also participated in the court-ordered psychological evaluation.

At the initial jurisdiction and disposition hearing in January 2023, the parents set the matter for trial on the truth of the allegations, placement, and the case plan.

H.    *Mother's Psychological Evaluation*

Mother's psychological evaluation showed that she was "formally diagnosed" with bipolar disorder during hospitalization. It indicated she "maintained fixed beliefs that both she and her son have received improper medical treatments and/or misdiagnoses."

Mother had smoked marijuana every other night for 10 years until she stopped after her December 2022 psychiatric hospitalization. Both her psychological evaluator and medication evaluator recommended that she be monitored closely for substance abuse due to her history of chronic pain and her potential for addiction.

Her psychological evaluator noted Mother suffered from severe depression and anxiety; schizoaffective disorder, bipolar type; cannabis dependence in early full remission; chronic pain disorder; and obsessive-compulsive personality disorder. Her psychological evaluator recommended extensive collaboration of a multidisciplinary team specializing in pain, prenatal treatment, and psychiatry for Mother, and with Z.W.'s pediatrician to ensure adequate care and to prevent Z.W.'s exposure to unnecessary medical procedures. Mother also needed to develop a support network of people with whom she could communicate openly about her mental health and her safety plan.

Overall, Mother "appeared limited in her insight regarding mental health concerns," and she maintained her fixed belief that her "mental health symptoms are all attributed to pain and will dissipate once adequate prescription pain medication is obtained." Nevertheless, Mother "genuinely appear[ed] to desire support in order to reunify with [Z.W.]" Her psychological evaluator opined that she would likely require "ongoing psychotherapeutic treatment" for the rest of her life, but she could make "measurable progress" in six to 12 months "if she remained highly engaged and motivated."

I.     *The Agency's Addendum Reports*

According to the Agency's February 2023 reports, due to Father's arrest, the criminal court issued a criminal protective order prohibiting him from contacting Z.W. except for court-ordered visitation. The parents obtained housing by late January 2023. They played with Z.W., fed him, and were affectionate with and attentive to him during their supervised visits.

Mother informed the social worker that the reports were incorrect and that she did not believe aliens or the government implanted something in her

son. Rather, she wanted answers and did not know what happened to Z.W. when he was out of her sight at the hospital. Mother stated she did not think they implanted anything, but she was concerned something could have been left in his throat during a procedure, and she wanted to have it checked out. She took Z.W. to the ear, nose, and throat department because the hospital failed to give her answers. She did not believe the medical appointments were unnecessary.

Mother agreed to participate in a medication evaluation and reported she had never refused medication but did not want to take any medication while she was pregnant. Mother believed she did not need any medicines except to address her pain. Mother declined medication for her mental health, and reported she only wanted medication to manage her pain, including Xanax, muscle relaxers, and controlled narcotics.

The clinician opined Mother had poor insight and judgment as to her mental health and advised the social worker that Mother might seek street drugs if she could not get what she wanted from medical providers. The clinician also advised that people with severe bipolar disorder and extreme mania often suffer from blackouts, lack insight, and do not know what to do next.

J. *Contested Jurisdiction and Disposition Hearing*

At the contested jurisdiction and disposition hearing in February 2023, Mother testified she believed that her child welfare services case remained active because she was still extremely concerned about Z.W.'s breathing, and she sought answers.

Mother testified she was alarmed by the internal fetal monitor placed on Z.W. during delivery. She also testified that hospital staff took Z.W. from

12

the hospital room three times, but she did not notice the breathing issue until their last day there.

When they got home from the hospital, the noisy breathing continued and sounded like a tube or plastic, which is why she asked for x-rays. She explained, "I don't know if it's something that [the hospital] did that created this floppy laryngeal malaysia [*sic*], tracheal malaysia [*sic*] diagnosis because, again, when he was first born, I do not remember hearing it. . . ." Also Z.W. was easy to feed because he did not burp, spit up, or have hiccups, and that made Mother wonder if they did something to make this baby so easy to nurse and feed.

Mother testified she went to the hospital in Hawaii in January 2022 to get away from drunk people on New Year's Day. She added that she also thought a hospital would have a solution for her back pain.

She explained that every time she complained about pain, she got a mental illness diagnosis instead of someone realizing that she had rods and screws in her spine. She testified that her bipolar diagnosis was incorrect, and she should have been properly diagnosed as suffering from scoliosis pain.

Mother acknowledged the children's hospital staff informed her that Z.W. had laryngomalacia. The next day, at a different hospital, she expected to hear, " 'There['s] something wrong with your child. Here is the treatment plan. This is what we would do.' " However, Mother's mental state was evaluated because she was "so worried and concerned and seeking answers." Although she wanted an explanation, she was not provided one, so she did her own research into Z.W.'s diagnosis.

Mother denied saying Z.W. had a valve in his bottom that tased him and caused him pain. She wanted to know if the other hospital had done something to Z.W. because of his noisy breathing, his vomiting spell, and the

fact that they had just moved back to San Diego. She noted that "the timing was very strange." She also denied telling anyone that aliens implanted a foreign object in his body and denied telling the hospital social worker she would not feed Z.W. until the doctor checked on him. Mother also testified she did not currently believe there was a foreign object in Z.W. because she "had him checked out by so many places and people." When asked why she had such a hard time accepting that there was no foreign object, Mother replied, "Because the breathing still is noisy." She testified she would not try to remove a foreign object from Z.W. herself.

Mother also denied kicking Father at the hospital in December 2022. She pushed him out of the way with her foot and "kicked him to tell him to leave the room." Mother testified she did not need Father's help to care for Z.W.

When asked how she would handle a stressful situation given her pain issues if Z.W. was returned to her care, Mother replied she would not want any injuries to happen to him, so she would be "overcautious and over endearing." She was participating in weekly virtual therapy sessions where she discussed issues she was having and her pain.

During her medication evaluation, Mother wrote that she preferred pain medications because bipolar medications had negative side effects and did not mitigate her pain. According to her, the evaluator warned her that the pursuit of pain management drugs would raise red flags and require a pain management doctor and a primary care doctor. If no one would prescribe her pain medication, Mother's plan for managing her pain was to focus on not rushing to pick Z.W. up now that he was older and walking. Mother testified the pain was worth it to hold him and she "will be in pain for

14

[him]." She had wanted to get her pain under control, but "now I realize I have to live with pain. It's part of my life. And that's okay."

K. *Findings and Orders*

The juvenile court found the allegations in the petition were true by a preponderance of the evidence. Z.W. is a child described within section 300, subdivision (b)(1). It declared Z.W. to be a dependent under the care, custody and control of the Agency and found by clear and convincing evidence his removal from parent's custody to be appropriate under section 361, subdivision (c)(1).

The court found there are "very clearly mental health challenges that lead her to observe medical issues, even in common experiences like a baby fussing and flipping during a diaper change, and draw from that implausible explanations." The court was concerned about Mother's fixation on medical malpractice, which it found continued to persist. It also found mother's repeated denial of medical explanations for Z.W. concerning: "Without those acknowledged and under control, there is going to be a substantial risk of detriment to [Z.W.], given the totality of the circumstances."

The court separately found that Father failed to challenge Mother and stop her and explained: "What we have before us is extremely dangerous conduct that was driven by a substance abuse issue that we are dealing with. . . . ¶ But we are just in the beginning of that long journey."

The court found the case plan to be "narrowly tailored" and "appropriate" and ordered reunification services and liberal supervised visitation for both parents.

15

DISCUSSION

Mother contends that there was no substantial evidence supporting the juvenile court's jurisdictional findings and removal orders. We disagree.

A.     *Standard of Review*

Section 300, subdivision (b)(1) authorizes dependency jurisdiction if a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child, . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).)

Proof by a preponderance of the evidence is all that is required to sustain a true jurisdictional finding. (§ 355, subd. (a).) In reviewing such findings, " 'we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633.) The appellant has the burden to show there is insufficient evidence to support the juvenile court's order. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103 (*Lana S.*); *In re N.M.* (2011) 197 Cal.App.4th 159, 168.)

After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *In re N.M., supra,* 197 Cal.App.4th at p. 169.) Because section 361, subdivision (c) requires proof by clear and convincing evidence, we determine "whether the record as a whole contains substantial

16

evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011; see also *In re V.L.*, at pp. 154–155 [standard of review described in *Conservatorship of O.B.* applies to removal findings under § 361, subd. (c)].)

B.    *Justiciability*

As an initial matter, we reject the Agency's argument that Mother's appeal is not justiciable because she does not challenge the jurisdictional allegations involving Father's conduct and substance abuse.  Indeed, Mother challenges the findings relating to Father when she cites *In re L.C.* (2019) 38 Cal.App.5th 646 for the proposition that a jurisdictional order sustaining a petition can be reversed where the record only shows that the parent used a drug but did not abuse the drug.  Based on *In re L.C.*, Mother argues that the jurisdictional findings relating to Father concerning "his abusing alcohol . . . arguably" do not support assuming jurisdiction.  Moreover, to the extent Mother "does not challenge all jurisdictional findings," we exercise discretion to evaluate the merits of her appeal.  (See *In re D.P.* (2023) 14 Cal. 5th 266, 283, 286 [even if an appeal is moot because a parent failed to demonstrate "a specific legal or practical consequence that will be averted upon reversal, . . . the court has discretion to decide the merits"].)

C.    *Jurisdictional Findings*

Mother incorrectly argues "there is no evidence that her mental illness and/or persistent beliefs harmed her son or placed him at substantial risk of harm."  In fact, a pediatrician specializing in medical child abuse opined that "[t]here is clear evidence that [M]other's persistent delusions have resulted in unnecessary medical testing."  Her delusions resulted in Z.W. being unnecessarily subjected to at least two foreign body x-ray series, a chest x-

17

ray, at least five emergency room visits, multiple endoscopies and a laryngoscopy.

Mother continues to suffer delusions. During a supervised visit in January 2023, Mother announced that Z.W. needed to see a pediatrician for his breathing. She stated, "It sounds like plastic is lodged in his throat." She added, "I don't get what that throat problem is." At trial, she remained concerned about Z.W.'s noisy breathing despite repeated assurances he would grow out of it. She testified she had an open case with child welfare services "[b]ecause [she] had extreme concern for [her] son's breathing, and [she] was still seeking answers." She was also still seeking a medical treatment plan and was frustrated that she was no longer in control of Z.W.'s medical appointments.

Mother points out that Z.W. "*does* suffer from a concerning respiratory condition" and that "foreign objects have been left inside patients." Even accepting Mother's views, substantial evidence supports the court's finding here. (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 168.)

Mother argues her mental illness no longer posed any risk to the child because she was "in individual therapy[,] she was evaluated by a psychologist[,] and she agreed to have her medications evaluated." She strenuously denied that she suffered from any mental illness during her trial testimony, attributing all her behaviors to her chronic pain. She also stated that she had no plans to take medication because she was pregnant again, and she did not believe she needed medication for anything other than pain.

Mother's refusal to acknowledge her mental illness is further evidence that a substantial risk of harm to Z.W. existed at the time of the jurisdictional and dispositional hearing. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to

18

acknowledge"]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].)

Because substantial evidence supports the juvenile court's finding that Mother's mental illness rendered her incapable of providing adequate care for Z.W., we need not address whether substantial evidence supports the court's other jurisdictional findings. (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127 ["[T]he juvenile court's jurisdiction may rest on a single ground"].) Nonetheless, there is substantial evidence that Z.W. suffered actual harm and was at continued risk of future harm due to the parents' dangerous conduct. One of Z.W.'s doctors, for example, opined that Mother had already exposed Z.W. to "psychological maltreatment" by engaging in "domestic violence" with Father at the hospital.

We conclude that Z.W. has experienced sufficient harm for purposes of section 300, subdivision (b)(1), and that the juvenile court did not err in assuming jurisdiction over Z.W. The juvenile court need not wait until Z.W. is seriously abused or injured to assume jurisdiction and take steps necessary to protect him. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843; *In re Heather A.* (1996) 52 Cal.App.4th 183, 194–195.)

D.    *Dispositional Findings*

Mother's arguments regarding the juvenile court's dispositional findings are similar to the arguments she raises regarding the jurisdictional findings.

The evidence documents risk that is not merely speculative, as Mother asserts. As discussed above, Mother's persistent delusions have caused Z.W. to undergo numerous unnecessary medical procedures. According to Father, Z.W. is not "safe" around Mother because of these procedures; Mother even

19

acknowledges they caused Z.W. to be "tortured." The court "may consider past events in deciding whether a child presently needs the court's protection." (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 165.) The child abuse pediatrician opined that children are at "extreme risk" of danger if a caregiver has "untreated psychotic symptoms related to foreign bodies inside their children." Father similarly feared Mother would "do something to [Z.W.]" due to her persistent beliefs.

Mother also continues to deny any mental health issues despite her diagnosis of bipolar disorder, mania, and mild substance use disorder. She is not on medication and may suffer from "manic blackouts" where she does not recall manic episodes. Multiple clinicians are concerned about substance abuse due to her history of chronic pain and her potential for addiction. She stopped using narcotics a few weeks before Z.W. was born. The child abuse pediatrician opined that returning Z.W. to an environment with "ongoing psychotic symptoms," "domestic violence," and "substance abuse/misuse" would place him at "extreme risk of ongoing and potentially escalating forms of maltreatment to include the possibility of death."

Due to her persistent delusions and unaddressed mental health issues, the juvenile court could reasonably conclude it was highly probable that Z.W. would still be at risk of harm. (See *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394.)

Mother also argues that the juvenile court should have considered a "family maintenance safety-plan" as a "reasonable means of protecting Z.W. without removing [him] from his parents' care." That is not a reasonable plan because Father had an active criminal protective order preventing placement of Z.W. with him, Father had just begun treatment for alcohol abuse, Mother had distanced herself her maternal family support system,

20

and there was substantial evidence Mother could not care for Z.W. alone. Thus, the court's finding that no reasonable means existed to protect Z.W. other than removal was supported by clear and convincing evidence.

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


IRION, J.


KELETY, J.